**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| LAS VEGAS SUN, INC., | No. 24-2287 |
| --- | --- |
| *Plaintiff-Appellee*, | |
| v. | D.C. No. 2:19-cv-01667-ART-MDC |
| SHELDON ADELSON; PATRICK DUMONT; NEWS+MEDIA CAPITAL GROUP, LLC; LAS VEGAS REVIEW-JOURNAL, INC.; INTERFACE OPERATIONS, LLC d/b/a ADFAM, | OPINION |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the District of Nevada
Anne R. Traum, District Judge, Presiding

Argued and Submitted December 5, 2024
San Francisco, California

Filed August 4, 2025

Before: Daniel P. Collins, Lawrence VanDyke, and
Salvador Mendoza, Jr., Circuit Judges.

Opinion by Judge Collins

## SUMMARY[*]

### Newspaper Preservation Act

The panel reversed the district court's order denying Defendants' motion to dissolve a stipulated injunction requiring Defendants, the current owners of the *Las Vegas Review-Journal* and affiliated persons, to continue to perform under a 2005 joint operating arrangement (JOA) between them and the owner of the *Las Vegas Sun*; and remanded for further proceedings.

The 2005 JOA amended a 1989 JOA entered into by the owner of the *Sun* and the previous owners of the *Review-Journal* pursuant to the Newspaper Preservation Act (NPA), which seeks to preserve otherwise failing newspapers by granting them an exemption from the antitrust laws allowing them, with the Attorney General's prior written consent, to combine publishing operations with another newspaper while preserving the independence of the respective newspapers' editorial and reportorial staffs. In the absence of such advance approval, the NPA generally provides that such JOAs are "unlawful."

When the current owners of the *Review-Journal* sought in 2019 to terminate the 2005 JOA on state-law grounds, the owner of the *Sun* (LVSI) brought this suit alleging that Defendants' efforts to terminate the 2005 JOA violated antitrust laws.

Although the parties initially stipulated to an order requiring them to continue to perform under the 2005 JOA

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

pending this litigation, Defendants later moved to dissolve the injunctive order on the ground that the 2005 JOA was unlawful and unenforceable because it had not been approved by the Attorney General. The district court denied Defendants' motion to dissolve the injunction, concluding that the Attorney General's approval was not required by the NPA.

The panel concluded that it has jurisdiction to review the district court's order denying Defendants' motion to dissolve the stipulated preliminary injunction, rejecting LVSI's arguments that (1) the appeal is not authorized under 28 U.S.C. § 1292(a)(1) (covering interlocutory orders refusing to dissolve or modify injunctions); and (2) Defendants are not "aggrieved" by the order and thus lack standing.

Turning to the merits, the panel rejected the reading adopted by the district court that the lack of Attorney General approval merely meant that the parties lacked any antitrust exemption under the NPA but did not invalidate the JOA or render it unenforceable. The panel wrote that the language of § 4(b) of the NPA is clear and unequivocal. It declares an unapproved agreement to be unlawful to enter and unenforceable.

Under the plain language of § 4(b), the 2005 JOA would be unlawful and unenforceable if it counts as (1) "a joint operating arrangement," (2) "not already in effect."

The panel observed that the phrase "joint operating arrangement" and "joint newspaper operating arrangement" are used interchangeably in the NPA and must be given the same meaning. Because the 2005 JOA meets all the requirements of a "joint newspaper operating arrangement" set forth in § 3(2) of the NPA, the panel concluded that it is

4          LAS VEGAS SUN, INC. V. ADELSON

a "joint operating arrangement" within the meaning of
§ 4(b).

The panel also concluded that the 2005 JOA was "not
already in effect." In doing so, the panel rejected the district
court's holding that, by limiting its applicability to JOAs
"not already in effect," § 4(b) reaches only new JOAs and
does not apply to amended JOAs. Section 4(b)'s exclusion
of JOAs "already in effect" is unmistakably a reference to
JOAs that predate the enactment of the NPA. A JOA
adopted before the NPA is one that is "already in effect," and
a JOA entered into after the NPA, even if it amends a prior
JOA, is one that is "not already in effect."

The panel therefore concluded that the 2005 JOA is
covered by § 4(b) and required the prior written consent of
the Attorney General. Because it did not receive that prior
written consent, the 2005 JOA is unlawful and
unenforceable. The district court thus erred in reaching a
contrary conclusion and in denying on that basis Defendants'
motion to dissolve the stipulated preliminary injunction.

---

## COUNSEL

E. Leif Reid (argued), Nicole S. Scott, Lucy C. Crow, and
Kristen L. Martini, Lewis Roca Rothgerber Christie LLP,
Las Vegas, Nevada; James J. Pisanelli, Todd L. Bice, and
Jordan T. Smith, Pisanelli Bice PLLC, Las Vegas, Nevada;
Joseph M. Alioto Sr., Alioto Law Firm, San Francisco,
California; for Plaintiff-Appellee.

Ian H. Gershengorn (argued) and Illyana A. Green, Jenner &
Block LLP, Washington, D.C.; David R. Singer, and Amy

M. Gallegos, Jenner & Block LLP, Los Angeles, California;
Gabriel K. Gillett, Jenner & Block LLP, Chicago, Illinois; J.
Randall Jones, Mona Kaveh, and Michael J. Gayan, Kemp
Jones LLP, Las Vegas, Nevada; Richard L. Stone, Los
Angeles, California; for Defendants-Appellants.

## OPINION

COLLINS, Circuit Judge:

In 1990, the U.S. Attorney General approved a 1989 joint
operating arrangement ("JOA") between the owners of the
*Las Vegas Review-Journal* and the *Las Vegas Sun*, pursuant
to the Newspaper Preservation Act ("NPA" or "the Act"). 15
U.S.C. § 1801 *et seq.* The NPA seeks to preserve otherwise
failing newspapers by granting them an exemption from the
antitrust laws allowing them, with the Attorney General's
"prior written consent," to combine publishing operations
with another newspaper while preserving the independence
of the respective newspapers' "editorial [and] reportorial
staffs." *Id*. §§ 1802(2), 1803(b). In the absence of such
advance approval, however, the NPA generally provides that
such JOAs are "unlawful." *Id*. § 1803(b).

In 2005, the parties to the 1989 JOA submitted an
amended JOA to the U.S. Department of Justice, but they
neither sought nor obtained written approval from the
Attorney General. When the new owners of the *Las Vegas
Review-Journal* later sought in 2019 to terminate the 2005
JOA on state-law grounds, the owner of the *Las Vegas Sun*
brought this suit against those owners and several affiliated
persons, alleging that Defendants' efforts to terminate the
2005 JOA violated the antitrust laws. Although the parties

6                LAS VEGAS SUN, INC. v. ADELSON

initially stipulated to an order requiring them to continue to perform under the 2005 JOA pending the litigation, Defendants later moved to dissolve that injunctive order on the ground that the 2005 JOA was unlawful and unenforceable because it had not been approved by the Attorney General under the NPA. The district court denied Defendants' motion to dissolve the injunction, concluding that the Attorney General's approval was not required by the NPA. Defendants have timely appealed that order pursuant to 28 U.S.C. § 1292(a)(1). We reverse.

# I

We begin by providing a brief overview of the relevant statutory background, which provides important context for the ensuing discussion of the factual and procedural history of this case.

## A

In *Citizen Publishing Co. v. United States*, 394 U.S. 131 (1969), the Supreme Court affirmed a decree invalidating, under §§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act, a JOA between two Tucson, Arizona newspapers, as well as the subsequent merger of the two newspaper companies. *Id*. at 134–35. The Tucson JOA was one of nearly two dozen such arrangements throughout the United States. *Committee for an Indep. P-I v. Hearst Corp.*, 704 F.2d 467, 473 (9th Cir. 1983). The Tucson JOA, like those in other jurisdictions, was ostensibly an effort to maintain editorial diversity by allowing an otherwise failing newspaper to preserve its "own news and editorial department," while "end[ing] any business or commercial competition between the two papers." *Citizen Publ'g*, 394 U.S. at 133–34. But the Supreme Court held that, in the Government's enforcement action against the Tucson JOA,

the district court correctly concluded that the defendants had failed to satisfy the requirements of the so-called "'failing company' defense—a judicially created doctrine." *Id*. at 136. Specifically, the Court agreed that there was no showing that the assertedly failing newspaper was "then on the verge of going out of business" or that, if that newspaper was to be sold, its cross-town rival was "the only available purchaser." *Id*. at 137–38 (citation omitted).

Congress promptly responded to *Citizen Publishing* by enacting the NPA, *see* Pub. L. No. 91-353, 84 Stat. 466 (1970), which has been classified as Chapter 43 of the unenacted Title 15 of the United States Code. *See* 15 U.S.C. § 1801 *et seq*. The declared policy of the Act is to "maintain[] a newspaper press" that is "editorially and reportorially independent and competitive in all parts of the United States" by "preserv[ing] the publication of newspapers" in any area "where a joint operating arrangement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions" of the NPA. *Id*. § 1801. The Act seeks to accomplish this goal by creating a limited express exemption from the antitrust laws for certain existing and future newspaper JOAs.

Specifically, § 4(a) of the Act generally exempts then-existing newspaper JOAs from certain antitrust laws—including the provisions at issue in *Citizen Publishing*—if, at the time the JOA "was first entered into, . . . not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication." 15 U.S.C. § 1803(a). This requirement to show only that the weaker newspaper was likely to remain financially unsound was intended to be a less stringent standard than *Citizen*

8                LAS VEGAS SUN, INC. v. ADELSON

*Publishing*, which we have described as essentially requiring a showing that "the financially troubled newspaper [was] on its deathbed." *Committee for an Indep. P-I*, 704 F.2d at 474.

For JOAs entered into after the Act's passage, § 4(b) of the Act grants a comparable antitrust exemption, if the parties obtain "the prior written consent of the Attorney General of the United States." 15 U.S.C. § 1803(b). That consent may be granted, under the Act, if the Attorney General determines (1) that the weaker newspaper is a "failing newspaper," *i.e.*, that it "is in probable danger of financial failure," *id*. § 1802(5); *see also id*. § 1803(b); and (2) "that approval of such arrangement would effectuate the policy and purpose" of the NPA, *id*. § 1803(b). Although this, too, was intended to be a less stringent standard than *Citizen Publishing*, we have held that it is nonetheless stricter than the "financially sound standard" applicable to then-existing JOAs under § 4(a). *Committee for an Indep. P-I*, 704 F.2d at 477; *see also id*. at 480 (holding that the "probable danger" standard requires a showing that, if "analyzed as a free-standing entity," the "failing newspaper" would probably "be closed and an editorial voice lost"). Section 4(b) states, however, that, in the absence of the Attorney General's "prior written consent," it "shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect."  15 U.S.C. § 1803(b).

With respect to pre-NPA JOAs that are amended or renewed after the enactment of the NPA, the statute provides that the "terms" of any such renewed or amended JOA "must be filed with the Department of Justice" and that no such amendment may "add a newspaper publication or newspaper publications to such arrangement." 15 U.S.C. § 1803(a).

LAS VEGAS SUN, INC. v. ADELSON          9

Several years after the NPA's passage, the U.S. Department of Justice ("DOJ") promulgated regulations implementing the Act, and those regulations remain in effect today in substantially unchanged form. *See* 28 C.F.R. § 48.1 *et seq*. Even though the statute explicitly states that it "shall be unlawful" to enter into or enforce a post-NPA JOA "except with the prior written consent of the Attorney General," 15 U.S.C. § 1803(b), the DOJ's regulations took the position that post-NPA JOAs were not *required* by the Act to obtain the prior approval of the Attorney General, *see* 28 C.F.R. § 48.1. Rather, the regulations opine that the NPA merely "provide[s] a method for newspapers to obtain the benefit of a limited exemption from the antitrust laws if they desire to do so." *Id*. The regulations adopting that construction were upheld, by a divided vote, in *Newspaper Guild v. Levi*, 539 F.2d 755, 755–56 (D.C. Cir. 1976).

**B**

In June 1990, Attorney General Dick Thornburgh approved a 1989 JOA between the owner of the *Las Vegas Review-Journal* (then Donrey of Nevada, Inc. ("Donrey")) and the owner of the *Las Vegas Sun* (*i.e.*, Las Vegas Sun, Inc. ("LVSI")). In his written opinion explaining his approval, Attorney General Thornburgh briefly sketched the history of the two papers. The newspaper now known as the *Las Vegas Review-Journal* began publication in 1909 and "was the only daily newspaper serving the area" until the *Las Vegas Sun* was introduced in 1950. Both papers continued publication for many years, but by the late 1980s, the *Sun* was in substantial financial trouble. The *Sun* had "lost money every year since 1981"; its advertising revenues had declined "every year since 1982, without exception"; and it had total debts of $11 million. In addition, the *Sun*'s circulation had dropped "considerably." Attorney General Thornburgh

concluded that "the *Sun*'s losses are, in all likelihood, irreversible," and that the *Sun* therefore had "been shown to be a 'failing newspaper' within the meaning of the NPA."

Attorney General Thornburgh also found that approval of the terms of the proposed JOA "would effectuate the policy and purpose" of the NPA. 15 U.S.C. § 1803(b). Under the JOA, the "business operations of the two newspapers" would be combined, "while preserving the newspapers' editorial and reportorial independence." The *Review-Journal*'s owner (*i.e.*, Donrey) would "take responsibility for the management, printing, and other commercial functions of the newspapers," with the *Review-Journal* publishing a morning edition, the *Sun* publishing an afternoon edition, and both papers publishing a "joint edition on Saturdays, Sundays, and holidays." The parties agreed that 90% of the "profits from operations" would be allocated to the *Review-Journal* and 10% to the *Sun*. After reviewing these and other details of the JOA, Attorney General Thornburgh concluded that "there appears to be no feasible alternative to the JOA that would preserve the *Sun* in operation" and that, by allowing the *Sun*'s independent editorial voice to survive, "the JOA would serve the statutory goal of maintaining an independent and competitive newspaper press."

Over the years, various disputes emerged over the proper application of the JOA, and the owners of the newspapers (who were then, respectively, "DR Partners," as successor to Donrey, and LVSI) ultimately sought to resolve these disputes by negotiating and executing an "Amended and Restated" JOA on June 10, 2005. Under the terms of the 2005 JOA, the *Sun* would cease publication as an afternoon paper and would instead be distributed as a six-to-ten-page freestanding insert to the *Review-Journal*. The prior JOA's

profit-sharing split was replaced by a more complex formula based on earnings before interest, taxes, depreciation, and amortization ("EBITDA"). LVSI was entitled to request an annual audit of the relevant EBITDA calculations, and in the event of a dispute, the issue would be resolved by arbitration.

DR Partners and LVSI did not seek the Attorney General's approval of the amended JOA. Instead, in June 2005, they delivered the amended JOA to the DOJ, together with a cover letter stating that the JOA was being submitted under "28 CFR § 48.16," which is the regulation that applies to amendment of *pre*-NPA JOAs. *See* 28 C.F.R. § 48.16 (providing for the filing of JOAs amending "the terms of an existing arrangement"); *id*. § 48.2(d) (defining "existing arrangement" to mean "any joint newspaper operating arrangement entered into before July 24, 1970"); *see also* 15 U.S.C. § 1803(a).

The DOJ promptly initiated an investigation into the 2005 JOA, sending a civil investigative demand to DR Partners in August 2005. The DOJ ultimately sent a letter to the parties in April 2008 stating that it was closing its investigation without having taken any action. According to the letter, the DOJ's decision "was not based on a conclusion that the 2005 amendments to the parties' Joint Operating Agreement are protected by the antitrust immunity afforded by the Newspaper Preservation Act" and that the 2005 JOA therefore "remains subject to antitrust scrutiny."

**C**

Over the ensuing years, disputes continued to arise among the parties to the 2005 JOA, leading to various lawsuits and arbitration proceedings. One such suit was brought in 2018 by LVSI in Nevada state court against the current owner of the *Review-Journal*, the Las Vegas Review-

Journal, Inc. ("LVRJI") and its parent company, News+Media Capital Group, LLC ("NMCG"). In August 2019, LVRJI and NMCG sought and obtained leave in that case to file an amended answer in which they asserted breach-of-contract counterclaims against LVSI and also sought a declaration that they could terminate the 2005 JOA for the alleged breach.

In response to this counterclaim, LVSI filed this action in federal court against LVRJI, NMCG, and two of the officers and owners of NMCG, Sheldon Adelson and his son-in-law Patrick Dumont.[1] LVSI alleged, *inter alia*, that LVRJI's efforts to terminate the 2005 JOA amounted to an attempt to monopolize the Las Vegas newspaper market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. A few days later, LVSI informed Defendants that it was planning to seek a preliminary injunction against the termination of the 2005 JOA, and it asked whether Defendants would be willing to avoid the need for such a motion by instead agreeing to a joint stipulation to maintain the status quo. The parties ultimately agreed to do so, while simultaneously preserving their respective rights and arguments. Under the terms of the stipulation and proposed order, LVRJI agreed to "continue to perform under the 2005 JOA," and Defendants agreed to "refrain from taking any non-judicial steps to terminate the 2005 JOA until after the entry of final judgment by a court of competent jurisdiction permitting such termination." The district court entered the stipulated order on October 9, 2019.

---

[1] The complaint was later amended to add, as an additional defendant, Interface Operations, LLC, which was alleged to be an Adelson-family-controlled entity through which the family members controlled the affairs of LVRJI. The respective defendants who were parties to the action at any given time are collectively referred to as "Defendants."

At some point prior to the filing of LVSI's federal lawsuit, Defendants became aware of the DOJ's April 2008 letter indicating that the DOJ did not consider the 2005 JOA to be protected by the special immunity granted by the NPA. In late October 2019, LVRJI and NMCG moved to dismiss LVSI's federal complaint on the grounds, *inter alia*, that the 2005 JOA never received the requisite approval; that it was therefore unlawful under the NPA; and that LVSI's claims that it would be an antitrust violation to abrogate that agreement necessarily failed as a result. In its order partially denying the motion to dismiss, the district court declined to resolve this issue. Noting that the complaint specifically alleged that the DOJ had "permitted" the 2005 JOA, the court viewed the motion to dismiss as an improper effort to go outside the pleadings to dispute this factual allegation.

After several years of discovery, the parties filed cross-motions for summary judgment in May 2023. In particular, both sides sought summary judgment with respect to Defendants' assertion that the 2005 JOA was unlawful under the NPA and unenforceable. Defendants filed a further motion arguing that, for the same reason, the stipulated preliminary injunction requiring them to continue to perform under the 2005 JOA should be dissolved.

In March 2024, the district court granted summary judgment to LVSI on the issue of the enforceability of the 2005 JOA, concluding that the agreement was not invalid merely because it had not been approved by the Attorney General. On that same ground, the court also denied Defendants' motion to dissolve the stipulated preliminary injunction.

**II**

Defendants appealed the denial of their motion to dissolve the stipulated preliminary injunction, asserting that the appeal was authorized under 28 U.S.C. § 1292(a)(1). LVSI disputes that contention, and alternatively asserts that Defendants lack standing to take the appeal. We conclude that we have jurisdiction over Defendants' appeal.

Under 28 U.S.C. § 1292(a)(1), we have jurisdiction to review, *inter alia*, "[i]nterlocutory orders . . . refusing to dissolve or modify injunctions." Here, there can be no doubt that the October 2019 stipulated order was an injunction: on its face, the order was entered by agreement of the parties "[i]n lieu of litigating" LVSI's anticipated "motion for preliminary injunction," and the order provisionally granted the exact relief that that motion would have sought, namely, an order "to prevent the termination of the 2005 JOA and to maintain the status quo through the pendency of this dispute." The order, however, explicitly clarified that Defendants could take *judicial* steps to terminate the 2005 JOA and that, in all events, both sides reserved their respective "rights [and] arguments" notwithstanding the stipulation agreeing to the order.

After Defendants' initial effort to raise the enforceability of the 2005 JOA at the pleading stage was rebuffed by the district court on the ground that it contradicted the complaint's allegations, Defendants subsequently re-raised the issue after substantial discovery was completed. They did so, *inter alia*, by filing a motion explicitly requesting that the October 2019 stipulated preliminary injunction be dissolved on the ground that, in light of the relevant facts, the 2005 JOA was unlawful and unenforceable. The district court then expressly denied Defendants' "motion to dissolve

preliminary injunction" in March 2024 on the sole ground that, based on the undisputed facts, the 2005 JOA was enforceable.

Because the district court's March 2024 order explicitly denied an express request to dissolve an injunctive order, Defendants' appeal of that denial "falls squarely within the language of section 1292(a)(1)," and we therefore have jurisdiction over this appeal without the need for any further showing. *Natural Res. Def. Council v. County of Los Angeles*, 840 F.3d 1098, 1101 (9th Cir. 2016) (citation omitted). Consequently, LVSI is wrong in contending that our jurisdiction here depends upon the sort of further showing that is required when an order sought to be appealed under § 1292(a)(1) does not explicitly deny an injunction but "only has the *practical effect* of denying an injunction." *Id*. (emphasis added) (simplified). In the latter circumstance, the appellant must make the further showing that the order will "have serious, perhaps irreparable consequences" that can only be redressed by an immediate appeal. *Negrete v. Allianz Life Ins. Co.*, 523 F.3d 1091, 1097 (9th Cir. 2008) (citing *Carson v. American Brands, Inc.*, 450 U.S. 79, 83–84 (1981)). But our caselaw has squarely held "that *Carson*'s 'requirement of irreparable injury' does *not* apply to 'appeals from the *direct denial* of a request for an injunction,'" but only to non-injunctive orders that are claimed to have the "'practical effect' of denying an injunction." *Natural Res. Def. Council*, 840 F.3d at 1101 (emphasis added) (citations omitted); *see also Paige v. State of California*, 102 F.3d 1035, 1038 (9th Cir. 1996) (holding that, where a party has appealed "from the specific grant of a request for an injunction," "*Carson* is simply irrelevant, and we have jurisdiction over the [party's] appeal under § 1292 even though the [party] has not alleged irreparable harm"); *Shee*

*Atika v. Sealaska Corp.*, 39 F.3d 247, 249 (9th Cir. 1994) (holding that *Carson* does not apply "to appeals from orders specifically denying injunctions"); *United States v. Phillip Morris USA Inc.*, 840 F.3d 844, 849 (D.C. Cir. 2016) (holding that § 1292(a) jurisdiction exists, without any showing of irreparable harm under *Carson*, "where the district court order 'clearly grants or denies a specific request for injunctive relief,' *such as a request to dissolve an injunction*" (emphasis added) (citation omitted)).

LVSI alternatively contends that, even if there is statutory jurisdiction under § 1292(a)(1), Defendants lack standing to appeal the March 2024 order because they have not been "aggrieved" by it. This argument is somewhat difficult to fathom, because Defendants are self-evidently aggrieved by an order that, they contend, unlawfully compels them to maintain a relationship with the *Sun* that they no longer want. *See*, *e.g.*, *ACF Indus. Inc. v. California State Bd. of Equalization*, 42 F.3d 1286, 1288–89 (9th Cir. 1994) (exercising jurisdiction over a defendant's appeal from an order denying a motion to modify a stipulated preliminary injunction). So far as we can discern from LVSI's brief, the argument that Defendants have not been aggrieved is merely a repackaging of LVSI's contention that Defendants are not suffering any *irreparable* injury from the court's order. We reject this effort to evade our above-described precedent holding that irreparable injury need not be shown when, as here, an explicit request to dissolve an injunction is denied.

Accordingly, we conclude that we have jurisdiction to review the district court's order denying Defendants' motion to dissolve the stipulated preliminary injunction.

LAS VEGAS SUN, INC. V. ADELSON 17

### III

In declining to dissolve its injunction requiring Defendants to continue carrying out the 2005 JOA, the district court relied solely on the ground that the JOA did not violate the NPA and that Defendants were wrong in contending otherwise. We turn, then, to whether the JOA was lawful and enforceable under the NPA, which is a legal question that we review de novo. *See United States v. Hughes*, 113 F.4th 1158, 1161 (9th Cir. 2024).[2]

In challenging the 2005 JOA, Defendants rely on § 4(b) of the NPA, which provides, in relevant part, that "[i]t shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States." 15 U.S.C. § 1803(b). Here it is both

---

[2] LVSI argues that we should not reach this issue but should instead affirm on the alternative ground that Defendants failed to show "a significant change in facts or law" that would "warrant[] revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000). We reject this contention. As we have explained, the stipulated preliminary injunction here expressly reserved the parties' respective "rights [and] arguments" concerning the validity of the 2005 JOA, and it also explicitly recognized Defendants' right to seek judicial termination of the JOA. Accordingly, this is not a situation in which the existing injunctive order was based on a judicial resolution of a disputed issue, thereby requiring the party seeking dissolution to make a threshold showing that this already-resolved issue should be revisited. On the contrary, the stipulated order here effectively *deferred* resolution of the JOA's validity until a later date. After Defendants' first attempt to raise that issue at the pleading stage was rejected by the district court, both sides then reasonably waited until after the completion of discovery to seek a ruling on that unresolved issue. Under these circumstances, Defendants were not required to make any further showing of a change in the facts or the law before requesting that the district court dissolve the injunction based on a resolution of this deferred issue.

undisputed and indisputable that the Attorney General did not provide "prior written consent" approving the 2005 JOA. Accordingly, if the 2005 JOA counts as "[1] a joint operating arrangement, [2] not already in effect," then, under the plain language of § 4(b), "[i]t shall be unlawful" for the parties "to enter into, perform, or enforce" that JOA. *Id*. We therefore must consider whether the 2005 JOA meets the two above-noted criteria necessary to trigger § 4(b)'s operative rule that the specified agreements are "unlawful." Before doing so, however, we first address a threshold issue concerning the scope of that rule.

**A**

The district court held (and LVSI agrees) that, even assuming *arguendo* that the 2005 JOA counted as a "joint operating arrangement, not already in effect," that agreement still "would be enforceable without the Attorney General's signature." The lack of Attorney General approval, the district court concluded, merely meant that the parties lacked any antitrust exemption under the NPA and were therefore "expose[d] . . . to antitrust liability," but it did "not invalidate the JOA or render [it] unlawful or unenforceable." The district court noted that this reading of § 4(b) was upheld in 1976 by a divided panel of the D.C. Circuit in *Newspaper Guild*, which rejected a challenge to the DOJ's 1974 implementing regulations expressly adopting that view. 539 F.2d at 760–61; *see also News Weekly Sys., Inc. v. Chattanooga News-Free Press*, 1993 WL 47197, at *2 (6th Cir. 1993) (adopting *Newspaper Guild*'s interpretation of § 4(b) without conducting any independent analysis). We reject this reading as squarely foreclosed by the plain language of the statute.

As always, "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted).  Here, as noted, the relevant language of § 4(b) states that "[i]t *shall be unlawful* for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, *except* with the prior written consent of the Attorney General of the United States."      15   U.S.C.    § 1803(b)    (emphasis    added). Accordingly, when an agreement is covered by § 4(b) (*i.e.*, it is a "joint operating arrangement, not already in effect"), and it lacks the "prior written consent of the Attorney General," the result expressly decreed by the statute is that it is "*unlawful*" to "enter into, perform, or enforce" that agreement. *Id*. (emphasis added).  This language is clear and unequivocal: § 4(b) declares such an unapproved agreement to be unlawful to enter into and unenforceable.

This plain-language reading is further confirmed by comparing the wording of § 4(b) with that of § 4(a).  As noted earlier, § 4(a) addresses JOAs "entered into prior to the effective date of this Act," Pub. L. No. 91-353, § 4(a), 84 Stat. at 467, while § 4(b) generally addresses post-NPA JOAs.  *See supra* at 4–5; *see also infra* section III(B)(2).  In sharp contrast to § 4(b), the language of § 4(a) notably *avoids* declaring anything to be "unlawful."  Instead, § 4(a) states that "[i]t shall *not be unlawful* under any antitrust law for any person to perform, enforce, renew, or amend" any pre-NPA JOA if, at the time the JOA "was first entered into," the weaker newspaper was likely to remain financially unsound.  15 U.S.C. § 1803(a) (emphasis added).  Congress could easily have used the same verbal formulation in § 4(b) and declared that "it shall not be unlawful under any antitrust

law" to "enter into, perform, or enforce" a JOA that has received the "prior written consent of the Attorney General." Had Congress done so, that would have produced the reading adopted by the district court: under that phrasing, which simply declares that approved JOAs are "not . . . unlawful under any antitrust law," the lack of such prior approval would simply mean that this *exemption* from the antitrust laws would not apply. But Congress did not replicate in § 4(b) the phrasing used in § 4(a). Instead, Congress affirmatively declared that it "shall be unlawful" to "enter into, perform, or enforce" a post-NPA JOA without prior approval. *Id*. § 1803(b). Moreover, the language of § 4(b) does not make that unlawfulness depend upon the applicability of any pre-existing antitrust law, but instead declares such unapproved agreements to be unlawful *simpliciter*.[3] The district court's reading of § 4(b)

---

[3] We note, however, that, when the Attorney General *grants* prior approval to a JOA under § 4(b), the result is not merely an exemption from § 4(b)'s prohibition, but also an exemption from the relevant "antitrust law[s]" described in the NPA. Because § 4(b) declares post-NPA JOAs to be "unlawful" "*except*" when the Attorney General has granted prior written approval under the *new* standards set forth in the NPA, the scope of the unlawfulness that is thereby removed by the Attorney General's approval must be understood as *also* extending to the antitrust laws that have been effectively displaced by the NPA's standards. (It would make no sense to read § 4(b) as requiring the Attorney General to grant approval based on standards that explicitly differ from those otherwise applicable under *Citizen Publishing* only to then subject such approved agreements to *Citizen Publishing*.) Accordingly, the scope of the *exemption* granted by Attorney General approval under § 4(b) should be read *in pari materia* with the scope of the exemption granted under § 4(a) and therefore must be understood as likewise extending to the "antitrust law[s]" described in § 3(1) of the Act. *See* 15 U.S.C. § 1802(1) (defining "antitrust law," for purposes of the NPA, as meaning specified antitrust statutes "and such statutes and any other Acts in pari materia" to those specified antitrust statutes); *see also*

improperly fails to give any effect to these striking differences in language between the two provisions. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (citation omitted)).

Indeed, neither the district court nor the panel majority in *Newspaper Guild* were able to point to any statutory language that would support their view that the effect of § 4(b) is not to *require* the prior approval of the Attorney General but merely to deny the antitrust exemption that would follow from obtaining that approval. On the contrary, the D.C. Circuit majority candidly conceded that "[a] rigidly literal reading of section 4(b) undeniably provides support" for the view—adopted by the district court in *Newspaper Guild*—that "all joint newspaper operating arrangements not in effect on July 24, 1970, must obtain the Attorney General's consent before they may be put into effect." 539 F.2d at 757 (quoting *Newspaper Guild v. Saxbe*, 381 F. Supp. 48, 53 (D.D.C. 1974)). But the majority rejected "rigid reliance upon the literal text of the statute" in favor of "delving more deeply into the congressional purpose" as reflected in the NPA's "[l]egislative history." *Id.* at 761. After extensively reviewing that legislative history, as reflected in the various committee reports and floor statements, the majority held that the plain-language reading of § 4(b) was, in its view, "at odds with the 'object and

---

*Hawaii Newspaper Agency v. Bronster*, 103 F.3d 742, 745 (9th Cir. 1996) (stating that approval from the Attorney General under § 4(b) yields the "same immunity" as under § 4(a)). Notably, such "other Acts in pari materia" would include the prohibition in § 4(b) of the NPA itself.

policy' of the Congress." *Id*. (citation omitted). *Newspaper Guild*'s wholesale disregard of the statutory text is a "relic from a 'bygone era of statutory construction'" that "inappropriately resort[ed] to legislative history" in lieu of "the statute's text and structure," and its "casual disregard of the rules of statutory interpretation" is flatly contrary to current Supreme Court authority. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436–37 (2019) (citation omitted); *see also Newspaper Guild*, 539 F.2d at 761 (Tamm, J., dissenting) (explaining that the majority's reading of § 4(b) reflected a "patent disregard of the plain and unambiguous language of [the] statute"). Where, as here, "a careful examination of the ordinary meaning and structure of the law itself . . . yields a clear answer, judges must stop," and they should not use legislative history "to 'muddy' the meaning of 'clear statutory language.'" *Food Mktg.*, 588 U.S. at 436 (citation omitted).

LVSI also notes that the view of § 4(b) endorsed in *Newspaper Guild* has been enshrined in the DOJ's implementing regulations since 1974. But after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), we no longer give deference to "'permissible' agency interpretations of the statutes those agencies administer," *id*. at 378. Thus, even assuming *arguendo* that the DOJ's construction of § 4(b) would have been given controlling deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *but cf. Newspaper Guild*, 539 F.2d at 761 (Tamm, J., dissenting) (arguing that, "[a]lthough great deference is due an interpretation of a statute by the agency or department charged with its enforcement," the DOJ regulation's reading of § 4(b) was contrary to the "plain and unambiguous language" of the NPA), that no longer matters, because

"*Chevron* [has been] overruled." *Loper Bright*, 603 U.S. at
412. We instead "must exercise [our] independent
judgment" as to the meaning of the NPA, *id*., and for the
reasons we have explained, we conclude that the reading of
§ 4(b) reflected in the DOJ regulations and endorsed in
*Newspaper Guild* is directly contrary to the statutory
language and must be rejected.[4]

**B**

It follows from what we have said thus far that, if the
2005 JOA counts as "[1] a joint operating arrangement,
[2] not already in effect," then, under the plain language of
§ 4(b), that JOA would be unlawful and unenforceable. We
next address whether those two respective requirements
have been met.

**1**

As LVSI notes, the phrase "joint operating arrangement"
in § 4(b) does not exactly align with the wording of the
phrase that is expressly defined in NPA § 3(2), namely, "joint
*newspaper* operating arrangement." 15 U.S.C. § 1802(2)

---

[4] *Newspaper Guild* also expressed the concern that, under a literal
reading of § 4(b), "a joint operating agreement between two *healthy*,
*non-competitive* newspapers" would be unlawful without the Attorney
General's approval, but that approval could not be given under § 4(b)
because neither would qualify as a "failing newspaper." 539 F.2d at 759
(emphasis added). This concern is misplaced. The NPA's expressly
declared purpose is "to preserve the publication of newspapers *in any
city, community, or metropolitan area*" where JOAs already exist or are
"hereafter effected" under the NPA. 15 U.S.C. § 1801 (emphasis added).
Moreover, the immunity granted by § 4(b) is an immunity from specific
antitrust laws, which presumes, of course, that the relevant newspapers
both operate in the same relevant market. Accordingly, it seems clear, in
context, that the JOAs covered by § 4(b) are only those involving
otherwise competing newspapers.

(emphasis added). But an examination of the statute as a whole confirms that the two phrases are used interchangeably throughout and that the use of one versus the other in any given instance is of no significance. The phrase "joint newspaper operating arrangement" is used exactly five times in the text of the statute (including in the definitional section in § 3(2)), while the phrase "joint operating arrangement" appears four times, and a third phrase—"joint operating agreement"—appears once. *See id*. §§ 1801, 1802(2), 1803(a)–(c), 1804(a)–(b). Notably, there are two sections in which *both* of the relevant phrases are used, and in each of these sections, the two phrases self-evidently mean the same thing. Thus, for example, § 4(a) establishes a general rule that certain pre-NPA "joint *newspaper* operating arrangement[s]" are exempt from specified antitrust laws, while § 4(a)'s *proviso* to that rule imposes certain additional requirements that apply to any amendment to a "joint operating arrangement." *Id*. § 1803(a) (emphasis added). Likewise, § 5(a) provides that, if any pre-NPA "joint operating arrangement" is the subject of a "final judgment" holding it "unlawful under any antitrust law" in "any action brought by the United States," "any party to such final judgment may reinstitute *said* joint *newspaper* operating arrangement to the extent permissible" under § 4(a). *Id*. § 1804(a) (emphasis added). Given that there is no discernible rhyme or reason as to which phrase is used in any given instance, and there are two instances that affirmatively confirm that the phrases are interchangeable, we conclude that the two phrases must be given the same meaning.

Consequently, we apply § 3(2)'s definition of a "joint newspaper operating arrangement" in determining whether the 2005 JOA counts as a "joint operating arrangement" for

purposes of § 4(b).  Section 3(2)'s definition, in its entirety, is as follows:

> The term "joint newspaper operating arrangement" means any contract, agreement, joint venture (whether or not incorporated), or other arrangement entered into by two or more newspaper owners for the publication of two or more newspaper publications, pursuant to which joint or common production facilities are established or operated and joint or unified action is taken or agreed to be taken with respect to any one or more of the following: printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; establishment of circulation rates and revenue distribution: *Provided*, That there is no merger, combination, or amalgamation of editorial or reportorial staffs, and that editorial policies be independently determined.

15 U.S.C. § 1802(2).

Here, the 2005 JOA is plainly a "contract, agreement, . . . or other arrangement," and it was indisputably "entered into by two or more newspaper owners for the publication of two or more newspaper publications." *Id*.  LVSI contends, however, that the 2005 JOA does not meet the further statutory requirement that the agreement be one "pursuant to

which [1] joint or common production facilities are *established or operated* and [2] joint or unified action is taken or agreed to be taken with respect to" certain enumerated publishing activities. *Id*. (emphasis added). LVSI does not contest that the second subclause is satisfied here, given that the 2005 JOA, on its face, establishes new terms for taking "joint or unified action" with respect to several of the enumerated publishing activities. However, according to LVSI, the first subclause is not met: the 2005 JOA "cannot be the agreement 'pursuant to which joint or common production facilities are established or operated,' as that was already done in the original JOA." But even assuming *arguendo* that it was the original JOA, and not the 2005 JOA, that "*established*" the "joint or common production facilities," it nonetheless remains true that, after the 2005 JOA, those facilities are thereafter "*operated*" "pursuant" to that amended agreement. 15 U.S.C. § 1802(2) (emphasis added). And because the relevant clause requires only that the facilities be "established *or* operated" pursuant to the agreement, *id*. (emphasis added), that clause's requirement is satisfied here. *See United States v. Woods*, 571 U.S. 31, 45–46 (2013) (noting that the "ordinary use" of "the conjunction 'or'" is "almost always disjunctive" and signifies that the "items are alternatives").

Moreover, the parties do not dispute that § 3(2)'s proviso is satisfied here. Under the 2005 JOA, "there is no merger, combination, or amalgamation of editorial or reportorial staffs," and the "editorial policies" of the two papers are "independently determined." 15 U.S.C. § 1802(2). The 2005 JOA expressly states that each newspaper will maintain its own "staff of news and editorial employees," and it contains additional provisions preserving "the news and editorial independence and autonomy" of both papers.

Because the 2005 JOA meets all of the elements of the definition of a "joint newspaper operating arrangement" in § 3(2), we conclude that it is a "joint operating arrangement" within the meaning of § 4(b).

**2**

We next consider whether the 2005 JOA counts as a joint operating arrangement that is "not already in effect." 15 U.S.C. § 1803(b).

The district court held that, by limiting its applicability to JOAs "not already in effect," § 4(b) reaches "[o]nly *new* JOAs" and does not apply to *amended* JOAs. We reject this reading as contrary to the statutory language. As we have already indicated, § 4(b)'s exclusion of JOAs "already in effect" is unmistakably a reference to JOAs that predate the enactment of the NPA: a JOA adopted before the NPA is one that is "already in effect," and a JOA entered into after the NPA, even if it amends a prior JOA, is one that is "not already in effect." That conclusion is reinforced by § 4(a), which expressly grants a limited antitrust exemption to JOAs "entered into prior to the effective date" of the NPA, which was July 24, 1970. Pub. L. No. 91-353, § 4(a), 84 Stat. at 467; *see also* 15 U.S.C. § 1803(a). By expressly excluding JOAs "already in effect" from its otherwise flat prohibition on performing or enforcing any JOA without the Attorney General's consent, § 4(b) thus avoids a conflict with § 4(a)'s special rules for pre-NPA JOAs. 15 U.S.C. § 1803(b). Likewise, by including a special rule for amendments of pre-NPA JOAs, § 4(a) confirms that they are not governed by § 4(b). *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (applying the canon that "a more limited, specific authorization" may be construed as an exception to a more "general authorization" in the same

statute). And, unlike § 4(a), § 4(b) has no analogous express carve-out for amended JOAs.

Furthermore, the district court's narrow construction of § 4(b) would seemingly create an odd gap in the statute in which amendments to *post*-NPA JOAs—no matter how significant—would not be subject to *any* limitations or requirements at all. The district court sought to fill this gap by engrafting onto post-NPA JOA amendments certain provisions of § 4(a) that govern *pre*-NPA JOA amendments. Specifically, the district court held that all amended JOAs—whether they are amendments of pre-NPA JOAs or of post-NPA JOAs—are covered by a proviso concerning amendments that is contained in § 4(a). The full text of § 4(a), including this proviso, is as follows:

> It shall not be unlawful under any antitrust law for any person to perform, enforce, renew, or amend any joint newspaper operating arrangement entered into prior to the effective date of this Act [*i.e.*, July 24, 1970], if at the time at which such arrangement was first entered into, regardless of ownership or affiliations, not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication: *Provided*, That the terms of a renewal or amendment to a joint operating arrangement must be filed with the Department of Justice and that the amendment does not add a newspaper

> publication or newspaper publications to
> such arrangement.

Pub. L. No. 91-353, § 4(a), 84 Stat. at 467, 15 U.S.C.
§ 1803(a). Although the language of the proviso, read in
isolation, could be construed as reaching any amendment to
any JOA, including a post-NPA JOA, there are several
textual reasons why that reading must be rejected.

As an initial matter, it is a well-established canon of
construction that "a proviso usually is construed to apply to
the provision or clause immediately preceding it."
*Pacificorp. v. Bonneville Power Admin.*, 856 F.2d 94, 97 (9th
Cir. 1988) (quoting 2A SUTHERLAND ON STATUTES AND
STATUTORY CONSTRUCTION § 47.33, at p.245 (4th ed.
1984)); *see also* ANTONIN SCALIA & BRYAN A. GARNER,
READING LAW: THE INTERPRETATION OF LEGAL TEXTS at 154
(2012) (stating that, under the "proviso canon," a "proviso
conditions the principal matter that it qualifies—almost
always the matter immediately preceding"). Under this
canon, the proviso in § 4(a) should be construed as applying
only to the matter that precedes it, namely, § 4(a)'s rules
about *pre*-NPA JOAs. Section 4(b) contains no comparable
proviso limiting its sweep, and nothing in the language or
placement of § 4(a)'s proviso suggests that it applies to
§ 4(b).

Moreover, there are additional textual clues that further
confirm that § 4(a)'s proviso applies only to the pre-NPA
JOAs covered by § 4(a) and not to the post-NPA JOAs
covered by § 4(b). In particular, there are two notable
relevant differences in the language used in § 4(a) and
§ 4(b). First, as we have already noted, § 4(b) is phrased as
a *prohibition* that declares unapproved post-NPA JOAs to
"be unlawful," while § 4(a) is not similarly worded: § 4(a)

instead says that "[i]t shall *not be unlawful* under any antitrust law" to take certain specified actions concerning pre-NPA JOAs. 15 U.S.C. § 1803(a)–(b) (emphasis added); *see also supra* at 18–20. Second, as we have also noted, § 4(a) expressly addresses amendments, whereas § 4(b) does not. *Compare* 15 U.S.C. § 1803(a) (stating that "[i]t shall not be unlawful under any antitrust law for any person to perform, enforce, renew, or *amend*" any pre-NPA JOA (emphasis added)), *with id*. § 1803(b) (stating that "[i]t shall be unlawful for any person to enter into, perform, or enforce" a post-NPA JOA without the Attorney General's approval). Taken in context, these two differences in language between § 4(a) and § 4(b) are clearly interrelated, and they confirm that § 4(a)'s proviso should be construed as applying only to § 4(a).

As we have explained, § 4(b)'s flat prohibition on any post-NPA JOA without Attorney General approval is broad enough to include, by its plain terms, both brand-new post-NPA JOAs *and* amended post-NPA JOAs. Because § 4(b)'s language is already broad enough to cover amendments, it is understandable that § 4(b) makes no specific reference to amended JOAs. By contrast, § 4(a)'s use of authorizing language, rather than prohibitory language, would *not* reach amended pre-NPA JOAs unless they are specifically mentioned. That is, if § 4(a) merely used the same relevant verbs as § 4(b)—namely, "perform" and "enforce"—§ 4(a) would *not* cover amendments: if § 4(a) had only provided that "[i]t shall *not be unlawful*" to "perform" or "enforce" a "joint newspaper operating arrangement entered into prior to July 24, 1970," § 4(a)'s antitrust-exemption rule would apply only to *unamended* JOAs. It is therefore unsurprising that § 4(a) adds an explicit affirmative antitrust exemption for "renew[ing] or amend[ing]" pre-NPA JOAs, which

Congress then expressly conditioned by adding a proviso limiting the types of "renewal[s] or amendment[s]" that are allowed and imposing a reporting requirement concerning such renewals or amendments. The district court overlooked these carefully nuanced and interrelated differences in language between § 4(a) and § 4(b) by instead taking the language of § 4(a)'s proviso out of context and treating it as a freestanding, across-the-board rule that applies equally to *both* § 4(a) and § 4(b).[5]

LVSI alternatively argues that § 4(b) cannot reasonably be read to apply to amendments to post-NPA JOAs, because amendments inherently cannot satisfy § 4(b)'s approval requirements. Section 4(b) states that, in order to approve a post-NPA JOA, the Attorney General must "determine [1] that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and [2] that approval of such arrangement would effectuate the policy and purpose" of the NPA. 15 U.S.C. § 1803(b). LVSI contends that, once an initial JOA is approved, the first of these two requirements can never be satisfied, because the previously troubled newspaper will

---

[5] We do not rely, however, on Defendants' argument that the scope of § 4(a) is confirmed by the temporally limited heading assigned to that section when it was classified as § 1803(a) of Title 15 of the United States Code. *See* 15 U.S.C. § 1803(a) (adding the following heading to § 1803(a): "Joint operating arrangements entered into prior to July 24, 1970"). Title 15 has never been enacted as positive law, and so the headings added to it "are merely editorial additions made by [the] congressional office" that "by statute has the task of assembling the United States Code, 'including those titles which are not yet enacted into positive law.'" *United States v. Ehmer*, 87 F.4th 1073, 1112 (9th Cir. 2023) (quoting 2 U.S.C. § 285b(3)). As such, these headings "are entitled to no weight." *Id*.

then no longer be a "failing newspaper." This argument is meritless.

The NPA states that, in addressing whether the weaker newspaper is a "failing newspaper," the Attorney General must determine whether that newspaper "is in probable danger of financial failure" "*regardless* of its ownership or affiliations." 15 U.S.C. § 1802(5) (emphasis added). As we have held, the latter clause "means simply that the ailing newspaper should be analyzed *as a free-standing entity*, as if it were not owned by a corporate parent." *Committee for an Indep. P-I*, 704 F.2d at 480 (emphasis added). Thus, in the case of an amended JOA, the question for the Attorney General would be whether, apart from the JOA, the weaker newspaper "is in probable danger of financial failure" if considered as a freestanding entity. 15 U.S.C. § 1802(5). If nothing has changed to suggest that the weaker paper could *now* survive as a freestanding entity, then this requirement will easily be met and the question will be simply whether the amended JOA "would effectuate the policy and purpose" of the NPA. *Id*. § 1803(b). Contrary to what LVSI contends, the statutory standard is thus readily applicable in the context of amended JOAs.[6]

The district court alternatively suggested that an amended post-NPA JOA *would* count as a JOA "not already in effect" only if the amended JOA constituted a "novation" of the prior JOA under the applicable state law. The district court held that this rule did not apply here, however, because

---

[6] LVSI also asserts that the review process for JOAs under the relevant regulations is too cumbersome to be applied to amended JOAs. Even assuming that this were true, it would not be an argument for ignoring the plain text of the statute; it would instead be an argument for revising the regulatory procedures to better conform to the text. *Cf. Loper Bright*, 603 U.S. at 412.

the 2005 JOA did not amount to a novation under Nevada law.  We need not address the parties' dispute over the latter point, because we conclude that the 2005 JOA is covered by § 4(b) even if it is not a novation.  Nothing in the text of the NPA supports engrafting a "novation" limitation onto § 4(b), and we lack the authority "to add words to the law to produce what is thought to be a desirable result." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015).  By its terms, § 4(b) applies to all post-NPA JOAs, including amended post-NPA JOAs.[7]

We therefore conclude that, because the 2005 JOA is a "joint newspaper operating arrangement" as described in § 3(2) and was "not already in effect" when the NPA was enacted, it is covered by § 4(b) and required the "prior written consent of the Attorney General."    15 U.S.C. § 1803(b).

## IV

For the foregoing reasons, we conclude that, because it did not receive the required "prior written consent of the Attorney General," the 2005 JOA is unlawful and unenforceable. 15 U.S.C. § 1803(b).  The district court erred in reaching a contrary conclusion and in denying on that

---

[7] LVSI contends that, in *Mahaffey v. Detroit Newspaper Agency*, 1998 WL 739902 (6th Cir. 1998), the Sixth Circuit adopted its view that amendments of post-NPA JOAs are not covered by § 4(b)'s approval requirement.  That is wrong.  In *Mahaffey*, the Sixth Circuit rejected the view that the "failure to seek and obtain approval" of the amended post-NPA JOA in that case "stripped even the *original* joint operating agreement of antitrust immunity." *Id*. at *2 (emphasis added).  As to whether the parties to the JOA in *Mahaffey* had immunity for "implementation of any unapproved amendment," the Sixth Circuit expressly declined to decide that issue, because it concluded that the private plaintiffs lacked standing to assert the antitrust claims that were based on those amendments.  *Id*.

basis Defendants' motion to dissolve the stipulated preliminary injunction. We therefore reverse the district court's order denying that motion, and we remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**